IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

GLAXOSMITHKLINE LLC )
(f/k/a SMITHKLINE BEECHAM )
CORPORATION), )
)
Plaintiff, )
)
v. ) C.A. No. 11-046 (RGA)(MPT)
) CONSOLIDATED
ANCHEN PHARMACEUTICALS, INC.; )
ANCHEN, INC; BANNER PHARMACAPS, )
INC.; ROXANE LABORATORIES, INC.; )
WATSON LABORATORIES, INC. – )
FLORIDA; MYLAN, INC.; MYLAN )
PHARMACEUTICAL, INC.; and IMPAX )
LABORATORIES, INC., )
)
Defendants. )

## GLAXOSMITHKLINE LLC'S POST-TRIAL BRIEF

OF COUNSEL:

William F. Lee
Lisa J. Pirozzolo
Sarah R. Frazier
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

Christopher R. Noyes
Andrew B. Zoltan
Corinne E. Atton
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10022
(212) 230-8800

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jblumenfeld@mnat.com
dfahnestock@mnat.com

*Attorneys for Plaintiff GlaxoSmithKline
LLC (f/k/a SmithKline Beecham
Corporation)*

Original Filing Date: April 8, 2013
**Corrected Version Filing Date: April 29, 2013**[1]

---

[1]     Citations updated to correspond to corrected trial transcript.

## TABLE OF CONTENTS

I.   PRELIMINARY STATEMENT ...................................................................................1

II.  ARGUMENT ............................................................................................................4

    A.   GSK's '467 Patent Meets the Utility Requirement of 35 U.S.C. §§ 101
         and 112 ......................................................................................................4

        1.   Roxane Ignores Governing Federal Circuit Precedents On Utility......4

        2.   The Disclosure in the Patent Application Demonstrates that
             Dutasteride is Useful, and Pre-Issuance Data Further Confirms Utility7

            a)   The *In Vitro* Data in Table I of the '467 Patent Establishes
                 the Utility of Dutasteride as a Potent Dual Inhibitor of
                 Both Types of 5AR ...............................................................8

            b)   The *In Vivo* Rat Test Result Reported in the '467 Patent
                 Further Demonstrates the Utility of Dutasteride ..........................8

            c)   The '467 Patent Expressly States that Dutasteride Could
                 be Useful in Treating BPH .................................................9

            d)   Unrebutted Evidence Available During Prosecution of
                 the '467 Patent Further Confirms Dutasteride's Utility.............11

            e)   Roxane's Contention that the Patent Claims are Invalid
                 Because the Specification Does Not Report Selectivity
                 Against the Androgen Receptor is Contrary to the Facts
                 and Applicable Law ..................................................12

    B.   The Invention Claimed in the '467 Patent Meets the Written
         Description and Enablement Requirements ...................................16

        1.   The Specification of the '467 Patent Provides Sufficient Written
             Description of the Claimed Invention....................................16

            a)   The Specification Not Only Describes Solvates, But
                 Includes Examples of Pharmaceutically Acceptable
                 Solvates .................................................................17

            b)   Defendants Incorrectly Rely on the Supposed Absence of
                 Examples in Support of Their Written Description
                 Argument.................................................................19

            c)   The Full Scope of the Claims is Described ...................23

i

2.     The '467 Patent Enables the Full Scope of the Asserted Claims.........27

     a)    To Invalidate Patent Claims for Lack of Enablement, Evidence of "Undue" Experimentation is Required ....................27

     b)    One of Ordinary Skill in the Art Could Make and Use Pharmaceutically Acceptable Solvates of Dutasteride Without Undue Experimentation Based on the Disclosure of the '467 Patent.......................................................................28

     c)    The BPAI Recently Considered and Rejected Defendants' Argument on Lack of Enablement of Claimed Solvates.............34

C.    Defendants Failed to Present Clear and Convincing Evidence that Merck Was the First to Discover the Claimed Invention ...............................35

    1.    The First to Reduce to Practice a Species Within a Genus Claim Has Priority of Invention to the Genus Claim ..............................................35

    2.    The Evidence Demonstrates that GSK Conceived of and Made Both Dutasteride and Pharmaceutically Acceptable Solvates Thereof Well Before Merck ........................................................................................36

     a)    Unrebutted Evidence Establishes that GSK Conceived and Made Dutasteride and Solvates of Dutasteride in 1993 ..............36

     b)    Merck's Purported Synthesis of Dutasteride Did Not Occur Until May 1994, and the Evidence Does Not Establish Independent Conception .................................................37

     c)    Defendants' Argument that Merck's Later Synthesis of Dutasteride Anticipates the '467 Patent Ignores Applicable Legal Principles .........................................................39

III.    CONCLUSION...................................................................................................40

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*AK Steel Corp. v. Sollac,*
    344 F.3d 1234 (Fed. Cir. 2003)......................................................................16

*Apotex USA, Inc. v. Merck & Co., Inc.,*
    254 F.3d 1031 (Fed. Cir. 2001)......................................................................35

*Ariad Pharm., Inc. v. Eli Lilly & Co.,*
    598 F.3d 1336 (Fed. Cir. 2010)...........................................................2, 16, 23

*Aventis Pharma Deutschland GMBH v. Lupin, Ltd.,*
    499 F.3d 1293 (Fed. Cir. 2007)......................................................................39

*Capon v. Eshhar,*
    418 F.3d 1349 (Fed. Cir. 2005)......................................................................23

*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.,*
    541 F.3d 1115 (Fed. Cir. 2008)......................................................................26

*Centocor Ortho Biotech, Inc. v. Abbott Labs.,*
    636 F.3d 1341 (Fed. Cir. 2011)...........................................................2, 20, 23

*Cephalon, Inc. v. Watson Pharms. Inc.,*
    707 F.3d 1330 (Fed. Cir. 2013)......................................................................27

*CMFT Inc. v. Yieldup Int'l Corp.,*
    349 F.3d 1333 (Fed. Cir. 2003)......................................................................28

*Creative Compounds, LLC v. Starmark Labs.,*
    651 F.3d 1303 (Fed. Cir. 2011)......................................................................36

*Cross v. Iizuka,*
    753 F.2d 1040 (Fed. Cir. 1985)...................................................................5, 6

*Edwards Lifesciences AG v. Corevalve, Inc.,*
    699 F.3d 1305 (Fed. Cir. 2012)........................................................................5

*Eli Lilly & Co. v. Actavis Elizabeth LLC,*
    435 Fed. Appx. 917 (Fed. Cir. 2011) ...............................................5, 6, 7, 11, 12

*Eli Lilly & Co. v. Teva Pharm., U.S.A., Inc.,*
    619 F.3d 1329 (Fed. Cir. 2010).........................................................2, 7, 12, 19

*Estee Lauder Inc. v. L'Oreal S.A.*,
    129 F.3d 588 (Fed. Cir. 1997) ....................................................................................38

*Ex parte Germeyer*,
Appeal 2010-005038, 2010 WL 4961695 (B.P.A.I. Dec. 1, 2010) ...........................3, 18, 26, 34

*Ex parte Liu*
Appeal 2009-015302, 2010 WL 3615693, at *1 (B.P.A.I. Sept. 15, 2010) ...............................34

*Ex parte Xiong Cai*,
Appeal 2011-005302, 2011 WL 6127936 (B.P.A.I. Dec. 7, 2011) ...................................4, 30, 34

*Ex parte Yijuang Chern*
Appeal 2011-008489, 2011 WL 5080233 (B.P.A.I. Oct. 24, 2011) ....................................18, 26

*Fox Grp., Inc. v. Cree, Inc.*,
    700 F.3d 1300 (Fed. Cir. 2012) ..................................................................................36

*Fujikawa v. Wattanasin*,
    93 F.3d 1559 (Fed. Cir. 1996) .......................................................................1, 5, 6, 8, 13

*Hahn v. Wong*,
    892 F.2d 1028 (Fed. Cir. 1989) ..................................................................................36

*Hybritech, Inc. v. Monoclonal Antibodies, Inc.*,
    802 F.2d 1367 (Fed. Cir. 1986) ..................................................................................28

*Hynix Semiconducter, Inc. v. Rambus Inc.*,
    645 F.3d 1336 (Fed. Cir. 2011) ....................................................................................1

*In re '318 Patent Inf. Litig.*,
    583 F.3d 1317 (Fed. Cir. 2009) .................................................................................5, 6

*In re Alonso*,
    545 F.3d 1015 (Fed. Cir. 2008) ..................................................................................27

*In re Brana*,
    51 F.3d 1560 (Fed. Cir. 1995) ...........................................................................1, 5, 6, 13

*In re Jolles*,
    628 F.2d 1322 (C.C.P.A. 1980) ....................................................................................5

*In re Sichert*,
    566 F.2d 1154 (C.C.P.A. 1977) ..........................................................................5, 11, 13

*In re Wallach*,
    378 F.3d 1330 (Fed. Cir. 2004) ..................................................................................19

ii

*In re Wands,*
    858 F.2d 731 (Fed. Cir. 1988)..........................................................................27, 30, 33

*In re Wright,*
    866 F.2d 422 (Fed. Cir. 1989)....................................................................................17

*Koito Mfg. Co. v. Turn-Key-Tech, LLC,*
    381 F.3d 1142 (Fed. Cir. 2004)..................................................................................27

*Lizardtech, Inc. v. Earth Res. Mapping, Inc.,*
    424 F.3d 1336 (Fed. Cir. 2005)..................................................................................28

*Medichem, S.A. v. Rolabo, S.L.,*
    437 F.3d 1157 (Fed. Cir. 2006)....................................................................................3

*Microsoft Corp. v. i4i Ltd. P'ship,*
    131 S. Ct. 2238 (2011) ..................................................................................................1

*Mikus v. Wachtel [I],*
    504 F.2d 1150 (C.C.P.A. 1974) ..................................................................................39

*Nelson v. Bowler,*
    626 F.2d 853 (C.C.P.A. 1980) ......................................................................................5

*Noelle v. Lederman,*
    355 F.3d 1343 (Fed. Cir. 2004)....................................................................................3

*Oka v. Youssefyeh,*
    849 F.2d 581 (Fed. Cir. 1988)....................................................................................36

*Pfizer Inc. v. Apotex Inc.,*
    731 F. Supp. 2d 741 (N.D. Ill. 2010)...........................................................................3

*Raytheon Co. v. Roper Corp.,*
    724 F.2d 951 (Fed. Cir. 1983)..................................................................................2, 6

*Solvay S.A. v. Honeywell Int'l, Inc.,*
    622 F.3d 1367 (Fed. Cir. 2010)............................................................................36, 39

*Streck Inc. v. Research & Diagnostic Sys., Inc.,*
    665 F.3d 1269 (Fed. Cir. 2012)..................................................................................23

**STATUTES**

35 U.S.C. § 6..................................................................................................................3

35 U.S.C. § 101 ..........................................................................................4, 6, 8, 9, 13

35 U.S.C. § 102(g) ............................................................................................ 4, 35, 40

35 U.S.C. § 112 ....................................................................2, 3, 4, 16, 18, 19, 27

**OTHER**

MPEP § 2107.03 .................................................................................................... 7, 12

## I.    PRELIMINARY STATEMENT

Having conceded infringement and abandoned any argument that GlaxoSmithKline's (GSK) invention of dutasteride claimed in U.S. Patent No. 5,565,467 ("the '467 Patent" or "the Patent") was obvious, Defendants now rely on four invalidity arguments rarely asserted against patent claims to new chemical entities.[2]  Defendants' arguments are inconsistent with applicable case law and unsupported by clear and convincing evidence.[3]

**Utility.**  Defendants'[4] contention that GSK's patent claims should be invalidated for lack of utility has no legal or factual basis.  To craft their utility argument, Defendants must ignore both long-standing legal principles governing utility as well as undisputed and abundant evidence that dutasteride is, in fact, useful.  In particular, Defendants disregard case law explicitly holding that, for new chemical compounds, a showing of any pharmacological activity can be sufficient to demonstrate utility.  *See Fujikawa v. Wattanasin*, 93 F.3d 1559, 1564 (Fed. Cir. 1996) ("In the pharmaceutical arts, our court has long held that practical utility may be shown by adequate evidence of any pharmacological activity.").   Testing sufficient to conclusively establish safety and efficacy in humans is not required.  *See In re Brana*, 51 F.3d 1560, 1568 (Fed. Cir. 1995) ("FDA approval … is not a prerequisite for finding a compound useful within the meaning of the patent laws." (citation omitted)).  Defendants do not dispute that dutasteride inhibits human Type 1 and Type 2 5-α reductase (5AR).  Approved by the FDA for treatment of benign prostatic hyperplasia (BPH) in 2001, dutasteride has been administered to

---

[2] Defendants asserted an obviousness-type double patenting defense at trial, but not in their opening post-trial briefs.  It is therefore waived.  *See Hynix Semiconducter, Inc. v. Rambus Inc.*, 645 F.3d 1336, 1354 (Fed. Cir. 2011).
[3] To prevail on their defenses, Defendants were required to present clear and convincing evidence of invalidity.  *See Microsoft Corp. v. i4i Ltd. P'ship*, 131 S. Ct. 2238, 2242 (2011).
[4] Only defendants Roxane and Mylan contend that the claimed invention is invalid for lack of utility.  Indicative of the lack of merit of a utility defense on these facts, Defendants Watson, Impax and Banner have not joined in this argument.

1

millions of patients.  Indeed, it is because dutasteride is a useful and commercially successful drug that Defendants seek approval to sell it.  *See Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 959 (Fed. Cir. 1983) ("People rarely, if ever, appropriate useless inventions.").  Defendants have not cited, and GSK has not found, a single decision invalidating patent claims to the active ingredient of an FDA-approved medication for lack of utility.  Instead, the Federal Circuit has held that compounds approved for testing in clinical trials (let alone for sale) are presumptively useful.  *See Eli Lilly & Co. v. Teva Pharm., U.S.A., Inc.*, 619 F.3d 1329, 1343-44 (Fed. Cir. 2010).  The common sense proposition that a drug approved as safe and efficacious by the FDA necessarily has utility under the Patent Act is correct and should be applied in this case.

**Written Description**.  Defendants' contention that the claims are invalid for failure to comply with the written description requirement of 35 U.S.C. § 112 is equally misguided. Defendants ignore the real invention—the remarkable molecule dutasteride.  They focus instead on an aspect of the claim that is well known in the art and routinely claimed in pharmaceutical patents, and in doing so misapply the law of written description.  All that written description demands is that the specification demonstrate that the inventors were "in possession" of the invention they claim.  Most often, it guards against patentees seeking to amend or add claims that go beyond what the specification describes.  *See, e.g., Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1345-46 (Fed. Cir. 2010).  Critically, it does not require working examples or actual embodiments of what is claimed, much less everything that is claimed.  *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1353 (Fed. Cir. 2011).

Here, the specification expressly describes solvates of dutasteride in the same language as the claims, as interpreted by the Court.  It provides the chemical structure of dutasteride itself and therefore the common structural feature of the claimed genus of solvated and unsolvated

forms of dutasteride.   Faced with similar patent claims, the Board of Patent Appeals and Interferences (BPAI)[5] has repeatedly held that, because making and characterizing solvates is so routine, disclosure of the chemical structure of a new compound without more is sufficient to support claims to "pharmaceutically acceptable solvates" of that compound under 35 U.S.C. § 112.  *Ex parte Germeyer*, Appeal 2010-005038, 2010 WL 4961695 (B.P.A.I. Dec. 1, 2010).

**Enablement**.   Under the enablement requirement of 35 U.S.C. § 112, a patentee does not need to teach what is already known in the art.   The sole requirement is that a person of ordinary skill in the art be able to practice the invention without undue experimentation.   Once again, the Defendants do not focus on the real invention, and with good reason.   The specification specifically discloses the chemical formula of dutasteride and how to make it.   Instead, the Defendants claim that a person skilled in the art could not make solvates of dutasteride without undue experimentation.   Def. Br. at 21-25.   But the concept of solvation has been known for more than a hundred years, and persons of ordinary skill in the art have been routinely making and screening solvates for decades.   Further, the claims are limited to "pharmaceutically acceptable solvates."   The evidence demonstrates that persons of ordinary skill in the art would focus on fewer than twenty solvents to make a pharmaceutically acceptable solvate for use in humans, further simplifying the experimentation that would be required to make pharmaceutically acceptable solvates of dutasteride.   As with the written description requirement, the BPAI has repeatedly found pharmaceutically acceptable solvates enabled without any detailed teaching of how to make solvates or any working examples.   *See, e.g., Ex parte Xiong*

---

[5] The BPAI is an administrative law body of the USPTO that decides issues regarding the patentability of patent applications.  35 U.S.C. § 6.  Although BPAI decisions are not binding, they are considered persuasive authority.  *See Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1163 (Fed. Cir. 2006); *Noelle v. Lederman*, 355 F.3d 1343, 1350 (Fed. Cir. 2004); *Pfizer Inc. v. Apotex Inc.*, 731 F. Supp. 2d 741, 751 (N.D. Ill. 2010) ("[F]ederal courts treat BPAI decisions as persuasive, non-binding authority.").

*Cai*, Appeal 2011-005302, 2011 WL 6127936 (B.P.A.I. Dec. 7, 2011).  The Defendants have provided no reason to depart from this persuasive authority.

**Prior Invention**.  Defendants' contention that GSK's patent claims should be invalidated under 35 U.S.C. § 102(g) due to the "prior invention" of dutasteride by Merck was wholly unsupported by the evidence.  Drs. Stephen Frye and Ken Batchelor testified that dutasteride was conceived in spring 1993, synthesized in July 1993, and demonstrated to be potent *in vitro* and *in vivo* by September 1993.  In contrast, no one from Merck testified at trial to explain the significance of the handful of documents upon which Defendants rely to prove prior invention, rendering that evidence insufficient to permit the Court to find any date of invention by Merck. The evidence was not only insufficient to establish a date of invention, but at best indicated that scientists at Merck made dutasteride in May 1994—nearly a year after it was conceived by Drs. Frye and Batchelor.  In short, Defendants presented no clear and convincing evidence of prior invention.

## II. ARGUMENT

### A.  GSK's '467 Patent Meets the Utility Requirement of 35 U.S.C. §§ 101 and 112[6]

#### 1.  Roxane Ignores Governing Federal Circuit Precedents On Utility

Roxane's brief ignores applicable legal principles that make clear that GSK's claims to the novel compound dutasteride satisfy the utility requirement of 35 U.S.C. § 101.  Four legal principles are particularly relevant to analyzing the issue of utility in this case.

First, statements of utility set forth in a patent specification "*must* be taken as sufficient to satisfy the utility requirement of § 101 for the entire claimed subject matter *unless* there is reason for one skilled in the art to question the objective truth of the statement of utility or its scope."

---

[6] Although nominally presenting its lack of utility argument under both Sections 112 and 101, Roxane's argument under Section 112 is wholly derivative of a utility argument under 101. Roxane Br. at 10.  Like Roxane, we therefore treat the two requirements as the same.

4

*Eli Lilly & Co. v. Actavis Elizabeth LLC*, 435 Fed. Appx. 917, 924 (Fed. Cir. 2011) (citation omitted); *see also In re Jolles*, 628 F.2d 1322, 1326 (C.C.P.A. 1980) ("Proof of utility is sufficient if it is convincing to one of ordinary skill in the art." (citation omitted)).  A party challenging utility must therefore demonstrate by clear and convincing evidence that statements in a patent specification about the utility of the claimed invention are not credible, *i.e.*, are "speculative, incredible, esoteric, factually misleading or contrary to the common knowledge of persons of ordinary skill in the art . . . ." *In re Sichert*, 566 F.2d 1154, 1159 n.5 (C.C.P.A. 1977). Only after such a showing is made "does the burden shift to the applicant to provide rebuttal evidence sufficient to convince such a person of the invention's asserted utility." *In re Brana*, 51 F.3d at 1566.  Defendants did not come close to demonstrating that the statements in the '467 Patent concerning the utility of dutasteride were not credible to persons of ordinary skill.

Second, when patent claims are directed to a newly discovered chemical compound (like dutasteride) and do not include a specific assertion of utility (such as the ability to treat a specific disease condition), *any* credible utility is sufficient to satisfy the utility requirement.  *See, e.g.*, *Cross v. Iizuka*, 753 F.2d 1040, 1045 (Fed. Cir. 1985); *Fujikawa*, 93 F.3d at 1564; *Nelson v. Bowler*, 626 F.2d 853, 856 (C.C.P.A. 1980) ("Knowledge of the pharmacological activity of any compound is obviously beneficial to the public.").  As a result, *in vitro* data alone is typically sufficient to demonstrate utility of a novel chemical compound such as dutasteride.  *See Fujikawa* 93 F.3d at 1562-63 (*in vitro* results alone were sufficient to establish utility of a compound claim); *see also In re '318 Patent Inf. Litig.*, 583 F.3d 1317, 1324-25 (Fed. Cir. 2009) ("[R]esults from animal tests or *in vitro* experiments may be sufficient to satisfy the utility requirement."); *Edwards Lifesciences AG v. Corevalve, Inc.*, 699 F.3d 1305, 1309-10 (Fed. Cir. 2012) (same).  Indeed, the Federal Circuit has recognized that *in vitro* test results are generally

5

predictive of *in vivo* results, and do not require showing of a rigorous correlation to establish utility. *See Cross*, 753 F.2d at 1050 ("*[I]n vitro* results … are generally predictive of *in vivo* test results, *i.e.*, there is a reasonable correlation therebetween. Were this not so, the testing procedures of the pharmaceutical industry would not be as they are."); *see also '318 Patent Inf. Litig.*, 583 F.3d at 1325 ("[A] rigorous correlation is not necessary where the disclosure of pharmacological activity is reasonable based upon the probative evidence." (citation omitted)); *Fujikawa*, 93 F.3d at 1565 (only a reasonable correlation is required). The *in vitro* data reported in Table I of the '467 Patent was sufficient, without more, to demonstrate the utility of the asserted patent claims.

Third, proof of utility is not limited to what is disclosed in the specification. If the Court were to determine that Roxane presented evidence sufficient to question the credibility of the statements in the '467 Patent regarding the utility of dutasteride (which it did not), GSK would be entitled to substantiate the stated utility with additional evidence, including evidence obtained after the '467 Patent was filed. *See In re Brana*, 51 F.3d at 1567 n.19 (declaration dated after filing date could be used to substantiate doubts as to utility asserted in specification); *Actavis*, 435 Fed. Appx. at 924-25 (rejecting utility challenge and noting that though patent office did not demand additional data to support utility during prosecution, applicant could have provided data obtained either before or after patent application was filed).[7] Here, GSK presented abundant substantiation of the stated utility, including evidence obtained before and after the patent application was filed, as the company developed dutasteride. Roxane has neglected to mention,

---

[7] Indeed, at least one Federal Circuit case suggests that post-patent issuance evidence, such as proof of infringement, is relevant to the utility inquiry. *See Raytheon Co.*, 724 F.2d at 959 ("A correct finding of infringement of otherwise valid claims mandates as a matter of law a finding of utility under § 101." (citations omitted)). However, GSK need not rely on post-issuance information in this case given the ample substantiation of utility obtained before the '467 Patent issued.

let alone rebut this substantial evidence of utility, and its expert Dr. Terry Brown conceded he did not even consider it. *See* Tr. 390:11-21 (Brown). This additional evidence conclusively rebuts each of Dr. Brown's arguments regarding utility.

Finally, a *novel compound* is *presumptively useful* if it has been administered in a clinical trial before the patent issues. *Teva Pharm.*, 619 F.3d at 1343; *Actavis*, 435 Fed. Appx. at 924; *see also* MPEP § 2107.03, at IV (8th ed. Rev. 9, Aug. 2012) (patent examiners "*should presume that the applicant has established that the subject matter of that trial is reasonably predictive of having the asserted therapeutic utility*" (emphasis added)).

> Before a drug can *enter* human clinical trials, the sponsor, often the applicant, must provide a convincing rationale to those *especially* skilled in the art (e.g., the [FDA]) that the investigation may be successful. Such a rationale would provide a basis for the sponsor's expectation that the investigation may be successful. In order to determine a protocol for phase I testing, the first phase of clinical investigation, some credible rationale of how the drug might be effective or could be effective [is] necessary.

MPEP § 2107.03, at IV (emphasis added). Here, dutasteride had not only been administered in clinical studies, but had been shown to effectively reduce DHT in humans by as much as 95% before the '467 Patent issued in October 1996. PTX-423.0019; *see also* Tr. 590:13-592:3 (Frye). This pre-patent issuance data conclusively establishes the utility of the patented invention.

### 2. The Disclosure in the Patent Application Demonstrates that Dutasteride is Useful, and Pre-Issuance Data Further Confirms Utility

Under the correct legal principles, Defendants have failed to prove lack of utility by clear and convincing evidence. They have even failed to cast any doubt on the stated utility in the specification. The *in vitro* data reported in Table I of the '467 Patent is sufficient in and of itself to establish the utility of dutasteride. The additional reported *in vivo* rat test result provided further (though unrequired) evidence of utility. Despite the fact that Roxane failed to present clear and convincing evidence that a person of ordinary skill in the art would question the utility

disclosure, GSK presented additional unrebutted evidence of utility, including the most persuasive possible evidence: successful human clinical trials.

### a) The *In Vitro* Data in Table I of the '467 Patent Establishes the Utility of Dutasteride as a Potent Dual Inhibitor of Both Types of 5AR

At the time of the invention, scientists were actively searching for compounds that would inhibit both Type I and Type II 5AR in man. Tr. 519:14-20; 521:12-15 (Batchelor); 580:23-581:1 (Frye); 834:3-8 (Andersson). The '467 Patent shows that dutasteride is a potent dual inhibitor of *human* Type I and Type II 5AR. In particular, Table I of the patent reports *in vitro* test data demonstrating that less than one nanomolar, a very small amount, of dutasteride inhibits human Type 1 and Type 2 5AR. JTX-8 at col. 9:58-67; *see also* Tr. 528:1-22 (Batchelor). Not a single witness questioned the veracity or reliability of the data set forth in Table I. *See, e.g.,* Tr. 844:12-23 (Andersson); 529:2-530:18 (Batchelor). Indeed, Roxane's expert Dr. Brown admitted that he trusted the data in Table I. Tr. 378:7-9 (Brown). He further admitted that the data showed that dutasteride was a "good inhibitor of both human Type 1 and Type 2 5AR isozymes." Tr. 346:6-9 (Brown).

The credible *in vitro* data set forth in Table I, which Defendants' own utility expert admitted was trustworthy, demonstrates the utility of dutasteride under 35 U.S.C. § 101. *See, e.g.*, *Fujikawa*, 93 F.3d at 1562-53.

### b) The *In Vivo* Rat Test Result Reported in the '467 Patent Further Demonstrates the Utility of Dutasteride

The utility disclosure in the '467 Patent is not limited to *in vitro* data, but also includes the result of confirmatory *in vivo* testing. JTX-8 at col. 10:1-14. The '467 Patent explains that in a standard rat assay commonly used to detect *in vivo* inhibition of 5AR, dutasteride reduced prostate weight. JTX-8 at col. 10:10-12 ("Reduction in the size of testosterone-stimulated

prostate weight demonstrated activity of the test compound."); *see also* Tr. 848:3-10; 849:14-850:1 (Andersson); 533:15-534:2, 534:11-20, 543:13-22 (Batchelor).   The *in vivo* result was consistent with the *in vitro* data reported in Table I.   Tr. 837:10-20, 838:11-18 (Andersson). Indeed, even Defendants' expert Dr. Brown admitted that reduction of rat prostate weight "could indicate inhibition of" 5AR.   Tr. 384:18-21 (Brown).

The *in vitro* and *in vivo* test results disclosed in the '467 Patent not only establish a correlation between *in vitro* and *in vivo* activity of dutasteride, but taken collectively are more than sufficient to satisfy the utility requirement of 35 U.S.C. § 101.

### c) The '467 Patent Expressly States that Dutasteride Could be Useful in Treating BPH

The '467 Patent also expressly states that dutasteride is useful to treat BPH:

[Dutasteride] is useful in the treatment of androgen responsive diseases, e.g., benign and malignant diseases of the prostate, especially benign prostatic hyperplasia, in a manner similar to that for other 5α-reductase inhibitors such as finasteride and SKF105657.

JTX-8 at col. 10:18-24.   In support of this statement, the '467 Patent described the already established correlation between "in vitro, rat in vivo and human clinical data" for finasteride, the only known FDA-approved, 4-azasteroid 5AR inhibitor.   JTX-8 at col. 10:24-29; *see also* Tr. 860:17-22 (Andersson).

The evidence established that persons of ordinary skill in the art would not doubt the credibility of that statement.   Tr. 836:21-837:20, 855:10-15, 860:23-861:10, 861:13-24 (Andersson); 544:11-20 (Batchelor).   Indeed, Defendants' expert Dr. Michael Pirrung admitted that persons of ordinary skill in the art would have "expected that dutasteride would have been effective in treating benign prostatic hyperplasia."   Tr. 489:21-490:1 (Pirrung).   Dr. Brown conceded that it was a "*reasonable hypothesis*" that 5AR inhibitors could be used "to treat some

9

disease conditions." Tr. 373:6-374:5 (Brown); *see also* 345:8-16 (Brown).[8]  And, of course, the evidence at trial established that the statement is true: dutasteride is FDA-approved to treat BPH.

Roxane's attempts to cast doubt on the statement of utility in the Patent fall far short of clear and convincing evidence.  Roxane focuses on five articles that allegedly show a lack of correlation between *in vitro* and *in vivo* test results for compounds *other than dutasteride* and irrelevant deposition testimony of GSK employees.[9]  *See* Roxane Br. at 4-5 and 11-12 (citing DTX-848, DTX-640; DTX-850; PTX-422; DTX-928; Tr. 421:10-21; 422:11-423:1 (Mook); 428:10-429:1 (Bramson)).  These references are irrelevant because, as discussed above, the Patent includes both *in vitro* and *in vivo* test results, thus demonstrating a correlation for dutasteride.  Moreover, none of these references demonstrate that a person of ordinary skill in the art would question the existence of a correlation between the *in vitro* and *in vivo* activity for a 4-azasteroid [10] 5AR inhibitor, such as dutasteride.   One reference does not show a lack of correlation because it *only* discloses *in vitro* data.  *See* DTX-640.0003 (Table I) and .0006-7 (Table II).  Two other references disclose the *in vitro* and *in vivo* activity of two 4-azasteroids (finasteride and 4-MA), both of which inhibit 5AR *in vitro and in vivo* and thus confirm the correlation.  *See* DTX-848.0002 (Abstract); DTX-850.0003 (Fig. 3 (compounds 4 and 5); col. 2 para. 2 through col. 3 para. 2).  The fourth reference also confirms the correlation, expressly

---

[8] The USPTO came to the same conclusion during prosecution of the '467 Patent.  *See* DTX-47.0642 and .0674 (the USPTO accepted GSK's submission that the *in vitro* and *in vivo* test results disclosed in the specification together with the established correlation for finasteride, were sufficient to demonstrate that dutasteride was "useful to treat androgen mediated diseases" such as BPH).

[9] To the extent Roxane's utility defense rests upon the assumption that the patentee must demonstrate a correlation between *in vitro* activity and *in vivo* **efficacy** (Roxane Br. at 11), that is incorrect.  Indeed, even the quotes from the cases cited by Roxane only refer to a correlation between *in vitro* results and *in vivo* **activity**.  *Id.*

[10] A 4-azasteroid has nitrogen at position number 4 on its steroid backbone.  *See* JTX-8 at col. 3:12-25; Tr. 942:15-16 (Davies).  By contrast, a 6-azasteroid has nitrogen at position number 6 on its steroid backbone.  Tr. 524: 3-6 (Batchelor).

stating that "[a] number of 4-azasteroids have now been found to possess excellent 5α-reductase inhibitor activity both in vitro and in vivo." PTX-422.0003. The fifth reference, DTX-928, and deposition testimony from GSK scientists Drs. Robert Mook and Neal Bramson, are also irrelevant because each describes the *in vitro* and *in vivo* activity of *6-azasteroids* (compounds with different a chemical structure from dutasteride). *See* Tr. 420:22-423:1 (Mook); 427:23-429:1 (Bramson) (compound GI 181931 was a 6-azasteroid); Roxane Br. at 5.

Thus, Roxane has failed to present clear and convincing evidence that a person of ordinary skill in the art would question the statements of utility in the '467 Patent, let alone find them not credible. *See Actavis*, 435 Fed. Appx. at 924; *In re Sichert*, 566 F.2d at 1159 n.5.

### d)   Unrebutted Evidence Available During Prosecution of the '467 Patent Further Confirms Dutasteride's Utility

Even if Roxane had raised a serious challenge as to the stated utility (which it did not), GSK presented additional evidence available prior to the October 1996 issuance of the '467 Patent conclusively establishing that statements of utility in the '467 were correct.  Roxane does not address this evidence, let alone rebut it by clear and convincing evidence.

### i.   Dutasteride Reduced Prostate Weight in Two *In Vivo* Rat Models

Tests performed before the initial '467 Patent application was filed showed that dutasteride reduced prostate weight in two different rat models.  In particular, pre-filing data demonstrated that dutasteride was more effective than finasteride at reducing prostate weight in the chronic rat model described in the Patent.  PTX-73.0001; *see also* JTX-8 at col. 10:4-14; Tr.

535:8-16 (Batchelor).  In addition, pre-filing data demonstrated that dutasteride reduced prostate weight by 50% in another standard model, the intact rat.[11]  PTX-407.0002.

### ii. Clinical Trial Data Demonstrated that Dutasteride Inhibited 5AR in Humans

By early 1996, GSK reported to the FDA that in human clinical trials dutasteride reduced circulating DHT in healthy men and in men with BPH by 95%.  PTX-423.0018-019; *see also* Tr. 590:13-592:3 (Frye).  These clinical results, obtained while the '467 Patent application was pending, were "amazing" and confirmed GSK's belief that "dutasteride could reduce DHT much more than finasteride."  Tr. 590:24, 591:11-12 (Frye).  Although Defendants' expert Dr. Brown admitted that dutasteride has been demonstrated to be clinically useful and that data existing after the Patent was filed could be relevant to utility, he ignored these clinical results in forming his opinions.  Tr. 368:22-369:11 (Brown); *see also* 389:23-390:7, 390:11-21 (Brown).  The unrebutted evidence that dutasteride was shown to be clinically effective in man before the '467 Patent issued conclusively establishes the utility of the claimed invention.  *See Teva Pharm.*, 619 F.3d at 1343; *Actavis*, 435 Fed. Appx. at 924; *see also* MPEP § 2107.03, at IV.

### e) Roxane's Contention that the Patent Claims are Invalid Because the Specification Does Not Report Selectivity Against the Androgen Receptor is Contrary to the Facts and Applicable Law

Roxane argued at trial and in its Opening Brief that the '467 Patent is invalid because the specification does not contain data showing that dutasteride does not bind to the androgen receptor, a characteristic that could be undesirable in a medication designed to treat BPH.  *See,*

---

[11] Roxane criticizes Dr. Andersson for considering intact rat data that was not reported in the Patent.  *See* Roxane Br. at 8 and 11.  The criticism is unfounded.  Evidence outside the patent application is relevant to the utility analysis.  *See, e.g., Actavis*, 435 Fed. Appx. at 925 ("Generally the applicant may provide data obtained either before or after the patent application was filed.").

12

*e.g.*, Roxane Br. at 2-3, 5-10, 13.  Respectfully, this issue is a red herring.  The extensive portion of Roxane's trial presentation devoted to this argument went to a legally irrelevant issue.

First, proof of selectivity against the androgen receptor is not necessary to demonstrate the utility of dutasteride.  Utility of a chemical compound can be demonstrated by any pharmacological activity.  *See Fujikawa*, 93 F.3d at 1564.  Indeed, a compound may have utility even if it exhibits undesirable side effects.  *See In re Sichert*, 566 F.2d at 1160 ("[T]he fact that many useful drugs exhibit some degree of toxicity or side effects [does] not provide a basis for refusal of a patent on such drugs as without utility under § 101." (citation and quotation omitted)).  Nor is there any requirement to demonstrate safety and efficacy, such as would be necessary to obtain FDA approval.  *See In re Brana*, 51 F.3d at 1568.  Given that the '467 Patent discloses that dutasteride is pharmacologically and therapeutically useful as a 5AR inhibitor, whether there was proof that dutasteride was also selective against the androgen receptor is of no legal consequence.[12]

Second, Roxane failed to present clear and convincing evidence that a person of ordinary skill in the art would have questioned the stated utility of dutasteride in the absence of testing for activity against the androgen receptor in light of prior art teaching that compounds like dutasteride and finasteride  (4-azasteroids with *hydrogen* at the 4-nitrogen position) were unlikely to bind to the androgen receptor.  Most notably, a 1986 paper by Rasmusson *et al.* disclosed that compounds with this structure "show greatly diminished receptor activity" and "will not interfere with [androgen] receptor action."  DTX-92.0001 and .0011; *see also* DTX-

---

[12] Moreover, it was not necessary for GSK to prove that dutasteride was selective against the enzyme 3βHSD.  To the extent the Patent explicitly references the import of selectivity against 3βHSD  (JTX-8 at col. 2:46-3:7), there is no dispute that the *in vitro* data in Table 1 of the Patent shows that it is.  JTX-8 at col. 9:57-67; Tr. 844:12-29 (Andersson); 529:10-530:2 (Batchelor); 379:5-13 (Brown).

13

92.0009 (referring to 4-azasteroids listed in Tables II to V: "When only a hydrogen [is] attached to [the 4-nitrogen position], receptor activity was greatly diminished…."). Another 1986 paper by Brooks *et al.* reported similarly. PTX-422.0004 ("A striking characteristic of these inhibitors is their relative inability to compete with DHT for binding sites on the androgen receptor…."). With the exception of Roxane's expert Dr. Brown, all witnesses at trial agreed that in light of Rasmusson and Brooks, persons skilled in the art in 1993 would *not* have expected dutasteride to bind to the androgen receptor. Tr. 851:10-18, 931:6-10, 932:4-9 (Andersson); 565:4-19, 568:12-20 (Batchelor); 617:1-6, 618:4-12, 618:23-619:3, 627:20-628:9 (Frye). Defendants' expert Dr. Pirrung agreed that a 4-azasteroid with hydrogen at the 4-nitrogen position, such as dutasteride, "was preferable … to minimize androgen receptor activity." Tr. 490:10-15 (Pirrung). And even Dr. Brown conceded that Rasmusson taught that compounds with this structure, *i.e.*, dutasteride, would not interfere with the androgen receptor. Tr. 397:22-398:3 (Brown).

Roxane's assertion that GSK's expert Dr. Stefan Andersson "reversed course" or made concessions on this issue mischaracterizes the record. *See* Roxane Br. at 6 and 13. Most notably, Dr. Andersson did not "reverse course" on his stated opinion that the patent provided sufficient information to demonstrate the utility of dutasteride, including a correlation between its *in vitro* and *in vivo* activity. *See, e.g.*, Tr. 837:10-20, 838:11-18, 844:12-23, 848:3-10, 849:14-850:1, 855:10-15, 860:17-861:10, 861:13-24 (Andersson). To the contrary, he simply admitted that the '467 Patent does not include data showing that dutasteride does not bind to the androgen receptor. Tr. 871:9-13 (Andersson). On cross-examination, Dr. Andersson was definitive that 4-azasteroids with hydrogen at the 4-nitrogen position would *not* bind to the androgen receptor. Tr. 925:3-7 (Andersson) ("[A.] I think, still there is a correlation. Q. And what is the correlation? A. Between NH compounds are *not* binding to the androgen receptor." (emphasis added)), 925:18-

14

20 (Andersson) ("[A.] I still believe there's a correlation to an NH *and no receptor binding*." (emphasis added)).  Instead of acknowledging this testimony, Roxane implies that Dr. Andersson testified precisely opposite, citing a portion of the trial transcript in which Dr. Andersson, a native Swedish speaker,[13] apparently misunderstood the questions put to him.  *See* Roxane Br. at 13; *see also* Tr. 926:10-21 (Andersson) ("[A.] *Hydrogen on the – hydrogen at the – I'm sorry. I'm missing – Q. You may not have followed.*").

In any event, although a person of ordinary skill would not question the utility of dutasteride due to concern about binding to the androgen receptor, GSK presented unrebutted evidence showing that dutasteride does not, in fact, bind to the androgen receptor.  A comprehensive report dated November 3, 1994 (available during prosecution of the '467 Patent) demonstrated that dutasteride does not inhibit any other enzymes or nuclear receptors.  PTX-419.0003, .0012, .0028-29; Tr. 539:4-13, 539:17-540:5 (Batchelor); *see also* 568:12-569:1 (Batchelor).  These tests confirmed what GSK scientists already believed to be true:  dutasteride does not bind to the androgen receptor.  *See, e.g.*, PTX-419.00029; Tr. 568:12-569:1 (Batchelor).

In sum, the *in vitro* data in Table I of the '467 Patent was sufficient, without more, to demonstrate the utility of the claimed compound under applicable case law.  *See supra* at II.A.2.a.  The *in vivo* rat result and credible statements of utility included in the Patent provide yet more credible support for utility.  *See supra* at II.A.2.b. & c.  And finally, post-filing, pre-patent issuance evidence including successful human clinical trials yet again confirmed that the statements of utility in the Patent were correct.  *See supra* at II.A.2.d.  Defendants thus failed to meet their burden to establish by clear and convincing evidence that the claimed invention lacks utility.  Indeed the overwhelming evidence was to the contrary.

---

[13] *See* Tr. 821:22-822:1 (Andersson).

15

**B. The Invention Claimed in the '467 Patent Meets the Written Description and Enablement Requirements**

Under 35 U.S.C. § 112, a patent application must satisfy two related, although independent, requirements. First, under the written description requirement, the application must "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date" of the patent. *Ariad Pharm.*, 598 F.3d at 1351. Second, under the enablement requirement, a person having ordinary skill in the art must be able to make and use the claimed invention without having to conduct undue experimentation. *AK Steel Corp. v. Sollac*, 344 F.3d 1234, 1244 (Fed. Cir. 2003).

Each application on which a patentee relies for establishing a presumptive date of invention as of the application's filing date must satisfy the requirements of Section 112. Although GSK is entitled to rely on the original filing date of U.S. Patent Application No. 08/123,280 ("the '280 Application"), it does not need to do so here to defeat the alleged prior invention of Merck. *See infra* at II.C; JTX-3. Accordingly, it is sufficient that U.S. Application No. 08/405,120 ("the '120 Application"), which directly resulted in the '467 Patent, provides adequate support for the claims.[14] *See* JTX-351.

**1. The Specification of the '467 Patent Provides Sufficient Written Description of the Claimed Invention**

The Patent fully describes the most critical aspects of the invention – the novel chemical entity dutasteride. It also provides more than sufficient description of "pharmaceutically acceptable solvates thereof," an aspect of the invention that would be readily understood by a person of ordinary skill once the novel chemical entity was disclosed.

---

[14]Because the specification of the '467 Patent is identical to the text of the '120 Application, citations are made to the specification.

16

### a) The Specification Not Only Describes Solvates, But Includes Examples of Pharmaceutically Acceptable Solvates

Many written description cases turn on whether a person skilled in the art would understand from the specification that the inventors had possession of the claimed subject matter when the specification describes the invention differently from how the invention is claimed. *See, e.g.*, *In re Wright*, 866 F.2d 422, 424-25 (Fed. Cir. 1989). This is not such a case. Rather, the '467 Patent expressly describes pharmaceutically acceptable solvates of dutasteride in words identical to the claim and the Court's claim construction, thus demonstrating that the inventors were in possession of the claimed invention. Nothing more is required.

Specifically, the Court defined "solvate" as "a complex formed by dutasteride with a solvent in which dutasteride is reacted or from which it is precipitated or crystallized." D.I. 243 at 4. The specification of the '467 Patent explicitly describes "solvates" in identical terms. It states that solvates are complexes of an organic compound with a solvent.[15] D.I. 243 at 5-6; JTX-8 at col. 3:58-4:4. The '467 Patent then notes that solvates can form when dutasteride is "reacted" in a solvent, "precipitated" from a solvent, *or* "crystallized" from a solvent. JTX-8 at col. 3:58-4:4; *see also* Tr. 650:7-653:19 (Byrn).

In addition, the specification of the '467 Patent includes specific examples of pharmaceutically acceptable solvates of dutasteride. For example, it describes hydrates of dutasteride (JTX-8 at col. 4:2-3), which would be readily known to persons of ordinary skill in the art to be pharmaceutically acceptable, *i.e.* as safe and therapeutic. PTX-144.003 (providing list of drug hydrates, citing Kuhnert-Brandstatter 1971); *see* Tr. 255:9-256:3 (Rogers). It also discloses pharmaceutical formulations containing solvates of dutasteride. JTX-8 at col. 11:23-

---

[15] Defendants claim that the definition of "solvate" contained in the '467 Patent differs from the "ordinary meaning" of the term. Def. Br. at 3. This assertion is incorrect and irrelevant.

29, 11:39-45, 11:51-54, 15:11-25. Example 3(D) describes a safe and effective formulation containing pharmaceutically acceptable solvates of dutasteride with propylene glycol and water. JTX-8 at col. 15:11-25; Tr. 688:5-689:17 (Byrn); 987:12-17 (Davies).

Examining similar inventions, the BPAI has concluded that disclosure of a compound's structure is sufficient to satisfy the written description requirement for solvates of that compound, even when (unlike the '467 Patent) the specification does not provide actual examples of the solvates or their structures. In *Germeyer*, for example, the claims included hydrates of steroid compounds. 2010 WL 4961695, at *3. The specification did not disclose examples or structures of the hydrates at issue, but the BPAI found sufficient written description, holding that there was no reason why "a person of ordinary skill in the art … would not credit [the patent applicants] with possession of hydrate embodiments of the invention …." *Id.* Similarly, in *Ex parte Yijuang Chern*, the BPAI found sufficient written description for solvates of a particular compound even though the specification did not depict the chemical structures of or teach how to make any solvates. *See* Appeal 2011-008489, 2011 WL 5080233, at *2-3 (B.P.A.I. Oct. 24, 2011).[16]

In sum, the specification of the '467 Patent expressly describes pharmaceutically acceptable solvates of dutasteride and provides examples meeting the limitations of the claims. This description of the precise subject matter of the claims is more than sufficient to satisfy the minimal written description requirements for claiming pharmaceutical solvates.

---

[16] Consistent with this precedent, the Examiner decided the specification satisfied the written description requirement. The Examiner initially rejected the claims under Section 112 for failing to describe what is claimed, JTX-47.0641, and asked, "[w]hat solvents are intended in 'solvates'? Acetone? Water? Isopropanol? DMSO? DMF? (par 2) specification provides no guidance (par 1)," JTX-47.0645. In response, the patentees cited the definition of solvate in columns 3-4 of the specification. JTX-47.0676. Subsequently, and without further inquiry, the Examiner withdrew the Section 112 rejection and allowed the asserted claims. JTX-47.0679.

### b)  Defendants Incorrectly Rely on the Supposed Absence of Examples in Support of Their Written Description Argument

The Defendants contend that the written description requirement is not met because the '467 Patent contains "no example of a crystallized (or precipitated) solvate of dutasteride" and "also fails to disclose a 'reacted' form of dutasteride solvate."  Def. Br. at 5, 16-19.  The Defendants' argument turns on the supposed absence of actual examples in the specification of the claimed solvates.  Those contentions are both legally irrelevant and factually erroneous.

### i.  The Specification is Not Required to Describe All Species Covered by a Generic Claim

The Defendants treat the Court's claim construction as if it were the text of the claim itself.  But that is not the law.  To be sure, if *a claim* expressly recites one or more species of compound, there must be adequate support for each species.  But the mere fact that a genus claim covers a variety of species does not require that the specification have written description support for each species.[17]  *See In re Wallach*, 378 F.3d 1330, 1334 (Fed. Cir. 2004) (description need not "be of such specificity that it would provide individual support for each species that the genus embraces" (quotation omitted)).  The Defendants' suggestion that the specification is required to satisfy the written description requirement for each of the species of a solvate potentially covered by the claims, as if each had been expressly claimed, is simply wrong as a matter of law.[18]  Thus, even if the specification failed to describe "crystalline" or "precipitated"

---

[17] For example, a claim might cover a type of "bacteria."  There are millions of species of bacteria that would be covered by the claim, but that does not mean that the specification must satisfy the requirements of Section 112 with respect to every such species to the same degree that would be required for species that might be expressly identified in a specific claim.

[18] Defendants' reliance on *Teva Pharm.*, 619 F.3d 1329, is thus misplaced.  Def. Br. at 15, 20.  That case did not involve "multiple groups" in a genus claim.  The claims at issue dealt with the size of particles of a drug, where the specification disclosed the particle size of "bulk drug substance" but was silent regarding particle size in a final formulation.  *Id.* at 1345.  Thus, the specification did not provide written description support for the claimed particle size in a final formulation.  *See id.*

19

solvates (which it does not), that fact would be irrelevant to the written description issue because reacted solvates are certainly described.  *See supra* at II.B.1.a.   Moreover, the evidence establishes that the way in which solvates of dutasteride form does not change the chemical nature of the novel compound dutasteride – dutasteride is always the same molecule with the same chemical formula, regardless of whether or not it is in solvated form.   Tr. 233:13-23, 234:17-235:3 (Rogers).

### ii.  Working Examples are not Required at All to Comply with the Written Description Requirement

Defendants also ignore Federal Circuit precedent making clear that working examples or actual embodiments are not required to satisfy the written description requirement, nor is an actual reduction to practice needed.  *See, e.g., Centocor*, 636 F.3d at 1351-52.  As the BPAI decisions discussed above indicate, the description of solvates (including crystalline and precipitated solvates of dutasteride) in the '467 Patent is sufficient written description for a claim directed to "pharmaceutically acceptable solvates," even without specific examples of solvates of dutasteride.  JTX-8 at col. 3:58-4:2.

### iii.  The Specification Includes Examples of Solvates

Even ignoring the legal flaws in the Defendants' theory, the '467 Patent in fact includes examples of pharmaceutically acceptable solvates of dutasteride.  As noted above, it contains specific working examples of pharmaceutically acceptable solvates of dutasteride in solution.  *See supra* at II.B.1.a.[19]  The Defendants are simply wrong in contending that the specification does not contain a single example of a pharmaceutically acceptable solvate of dutasteride.  The Defendants' argument is based on their contention that "a solution is not a solvate."  Def. Br. at

---

[19] GSK presented evidence at trial showing that GSK made pharmaceutically acceptable solvates of dutasteride by as early as July 1993.  *See, e.g.,* Tr. 541:9-542:7 (Batchelor); JTX-5.

19.  This argument is premised on the assertion that "dissolution is not a reaction, and thus a solution is not a solvate." *Id*.  The argument fails for three reasons.

First, Defendants argue that the claimed solvates must be in solid form (*i.e.*, crystalline), presumably to support their contention that the Patent's examples of dutasteride solvates in solution (such as Example 3D) are irrelevant to the written description analysis.  In so doing, they improperly seek to revisit the Court's claim construction.  In particular, the Defendants contend that the term "react" (including the use of that word in the Patent's description of "solvates") necessarily refers to formation of a "new chemical … through the making or breaking of covalent bonds." Def. Br. at 6.  But Defendants' argument is at odds with the plain language of the specification, viewed in light of their own concession that solvates are formed by creating non-covalent bonds.[20]  *See id*. at 6 n.4.  Given the parties' agreement that solvates are formed by creating non-covalent bonds, it makes no sense to read the word "reacted" in the description of solvates to exclude complexes created by non-covalent bonds.  Nor does it make sense to construe the term "reacted" in the description of solvates to require formation of a "new chemical" when the evidence at trial established that solvate formation does not result in a new chemical.  Tr. 653:20-654:2 (Byrn); 233:18-23 (Rogers).  In short, there is no sound basis to argue that Example 3D of the Patent, which is a dutasteride solvate in solution, does not describe a pharmaceutically acceptable "solvate of dutasteride."

---

[20] In their brief, Defendants curiously omit reference to the two most pertinent uses of the words "reacted" or "reaction" in the '467 Patent, *i.e.*, in the description of solvates in col. 3:60, and the description of conversion of dutasteride into pharmaceutically acceptable solvates in col. 8:55. They cite only to other portions of the specification that use the word "reaction" or "reacted" in connection with synthesis of new chemical compounds.  The failure to address the most pertinent references to "reaction" in the patent substantially undermines Defendants' argument.  Moreover, Defendants' substantive questions to Dr. Byrn were confined to the use of the term "reaction" in the context of chemical synthesis, not the more relevant uses of the word in connection with solvates.  *See* Tr. 750:13-757:22.

Second, the evidence at trial demonstrates that a person of ordinary skill in the art recognizes dissolution as a reaction. Dr. Stephen Byrn, a former member of the Bioavailability and **Dissolution** Committee of the United States Pharmacopeia, testified that dissolution is a reaction that results in a complex between a compound and a solvent. Tr. 639:22-640:1; 675:7-678:5 (Byrn). This testimony is consistent with the specification of the '467 Patent, which, as described above, equates solvate formation with a reaction. The uncorroborated testimony of Defendants' expert is not clear and convincing evidence to the contrary.

Finally, the evidence at trial established that dissolution can form solvates *in* solution.[21] For at least 100 years, solvates have been known to exist in solution. PTX-222; PTX-340; PTX-144.012; Tr. 201:20-22, 202:23-203:5 (Rogers). Dr. Stephen Davies testified that "when a compound dissolves in water, it forms a solvate with that, with a solvent." Tr. 987:15-17 (Davies). Dr. Frye testified that "when you dissolve [a compound], it's also solvated by the solvent. And that is a solution solvate." Tr. 593:18-20 (Frye). Dr. Rogers conceded that "the term solvation is often used to describe the process by which solvent molecules interact with dissolved molecules" and that in "the field of solution chemistry [scientists] do use terms that include solvate to include molecules that are surrounded by a solvent with some interaction." Tr. 201:10-13; 201:15-19 (Rogers). Indeed, Dr. Rogers **admitted** that solvates can be formed by dissolution. Tr. 201:15-19, 202:23-203:5 (Rogers).

---

[21] Much of Defendants' argument is premised on the incorrect assertion that Dr. Byrn opined solutions are solvates, even calling it "Dr. Byrn's solution-is-a-solvate opinion." Def. Br. at 7-8. Dr. Byrn has never opined that a solution itself is a solvate. Dr. Byrn opined, consistent with 100 years of chemistry, that solvates can exist *in* a solution. Tr. 654:18-22, 687:23-688:4 (Byrn). Even Dr. Rogers could not dispute that this was accurate. *See* Tr. 201:10-13; 201:15-19 (Rogers).

### c)  The Full Scope of the Claims is Described

The Defendants separately argue that the specification fails to "adequately describe the full scope of the claimed genus of pharmaceutically acceptable dutasteride solvates." Def. Br. at 20.  They argue that the claims are "genus" claims and that, even if a solvate in solution is described, they are invalid because of the supposedly inadequate disclosure of crystalline or precipitated solvates.  This claim scope argument is simply another way for Defendants to argue that working examples are required for all species within the scope of a claim.  They are wrong.  In describing the chemical structure of dutasteride itself and pointing out that it also exists in solvated form, the specification adequately described the claimed genus and its structural features.  *Ariad*, 598 F.3d at 1350, 1352 (the written description doctrine "has always expressly permitted the disclosure of structural features common to the members of the genus").

"[T]he level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.* at 1351 (citations omitted); *see Capon v. Eshhar*, 418 F.3d 1349, 1357 (Fed. Cir. 2005).  Less detail is required where, as here, the relevant technology is routine or well developed.  *Centocor*, 636 F.3d at 1351.  In such cases, "a patentee can rely on information that is 'well-known in the art' to satisfy written description." *Streck Inc. v. Research & Diagnostic Sys., Inc.*, 665 F.3d 1269, 1285 (Fed. Cir. 2012).

The technology necessary to make and test solvates was well-known long before 1993. *See generally* PTX-135; PTX-222; PTX-340; PTX-359; DTX-300; Tr. 200:14-201:1, 201:2-22, 208:10-210:9, 211:6-212:13 (Rogers); 634:21-635:5, 636:11-17, 642:6-12, 650:18-651:6, 656:15-657:9, 698:15-704:16 (Byrn).  Experts for both sides agreed that persons of ordinary skill have known for decades that solvates are formed through a process called "solvation."  Tr.

23

201:2-22 (Rogers); PTX-222.   During solvation, solvent molecules interact with dissolved molecules of a compound to create a solvate.  Tr. 201:15-22, 202:23-203:5 (Rogers); PTX-222; PTX-340.

Defendants' expert Dr. Rogers acknowledged scientific literature describing solvates in solution as early as 1913, and further agreed that crystalline solvates are "a basic scientific concept."[22]  Tr. 199:23-201:1, 201:20-22, 202:6-203:5 (Rogers); PTX-222; *see also* PTX-340. Indeed, technology for making crystalline and amorphous solvates through the processes of crystallization and precipitation, respectively, has been known for at least 50 years.   DTX-300.0010;  PTX-135;  PTX-144.0012;  PTX-222;  PTX-340.0006;  PTX-359;  Tr.  201:2-22 (Rogers); 650:7-653:19 (Byrn).   And methods for making and testing crystalline solvates have been reported in scientific literature since at least the 1960s and 1970s.  PTX-135; DTX-300. Dr. Byrn published on crystalline and amorphous solvates starting in the late 1970s.  Tr. 635:3-5 (Byrn).   And Dr. Rogers published on crystalline solvates that he made and tested as an undergraduate in 1978, before he was even a person of ordinary skill in the art.  Tr. 208:10-210:3 (Rogers).   Moreover, of particular relevance here given that dutasteride is a steroid, methods for making solvates of steroids in solutions and as crystals had been reported in the literature as early as 1983.  Tr. 193:2-4 (Rogers); 670:8-10 (Byrn); PTX-135; PTX-359.

---

[22] Defendants essentially ignore Dr. Rogers' admission that the scientific literature described solvates in solution, and instead criticize Dr. Byrn (whose research focused on solid state solvates) on the grounds that he supposedly wrote about solvates in solution only one time in 1999.  PTX-144.0012 (referring to "solvated solute species" and "solvated solution species"). The number of times Dr. Byrn wrote about solvates in solution does not make the scientific literature reporting solvates in solutions any less relevant; indeed, it confirms that the concepts of solution chemistry have been well-known and developed for more than a century.  Moreover, Dr. Byrn also wrote about solvates in solution as early as 1969, years prior to his 1999 publication. Tr. 634:21-635:2 (Byrn).

24

The evidence at trial also established that the size of the claimed genus of solvates is small. Tr. 690:24-691:6 (Byrn). In particular, the experts all agreed that a person of ordinary skill in the art would focus on a limited number of safe solvents to make a "pharmaceutically acceptable" solvate of dutasteride. PTX-145; PTX-178; PTX-341; Tr. 223:13-224:16 (Rogers); 661:6-15, 690:8-12 (Byrn). The evidence at trial established that in 1993 a person skilled in the art could thus readily visualize pharmaceutically acceptable solvates of dutasteride as those made with a limited number of known safe solvents. Tr. 224:17-22 (Rogers); 689:12-17, 690:5-7, 690:24-691:6 (Byrn). Dr. Byrn testified that he had published a paper with scientists from the FDA identifying only nine solvents that one of ordinary skill in the art would use to make pharmaceutically acceptable solvates. PTX-145; Tr. 666:10-668:16 (Byrn). And even Defendants' expert Dr. Rogers admitted that Remington's Pharmaceutical Sciences and the United States Pharmacopeia, two references that one of ordinary skill in the art would consult for lists of pharmaceutical ingredients, disclose fewer than twenty solvents for making pharmaceutically acceptable solvates. Tr. 222:9-223:4, 223:24-224:24, 226:21-227:6, 228:20-229:24 (Rogers). These solvents are common, uncomplicated molecules relative to dutasteride and do not contribute to 5AR inhibition.

Thus, the claimed solvates are not "widely variant species," as Defendants suggest. Def. Br. at 15. The definition of "solvate" in the '467 Patent expressly describes the structural features common to all pharmaceutically acceptable solvates of dutasteride—dutasteride complexed with a solvent. JTX-8 at col. 3:58-4:4. Indeed, this Court recognized that the only "ingredients" in a solvate are "organic compounds combined with solvents." D.I. 243 at 5. Accordingly, a person of ordinary skill in the art reading the definition of "solvate" in the '467

Patent could visualize or recognize a solvate of dutasteride based on the compound's structure.[23]
*Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1124 (Fed. Cir. 2008)
(holding a specification satisfies the written description requirement by disclosing genus'
"relevant, identifying characteristics, *i.e.*, structure or other physical and/or chemical properties");
*Yijuang Chern*, 2011 WL 5080233, at *2-3 (genus of solvates described due to structural
commonality of genus based on single described compound). Here, the common structural
feature—the core of the invention— is dutasteride.

Finally, the evidence also established that a person of ordinary skill in the art could
readily visualize solvates of dutasteride that would have a therapeutic effect. In particular,
experts on both sides agreed that in order to have some therapeutic effect, a dutasteride solvate
must be bioavailable. Tr. 160:12-24, 236:20-24 (Rogers); 639:9-18, 703:14-23 (Byrn). In 1993,
it was well-known that a compound would have to be in solution to be bioavailable and therefore
be pharmaceutically active. Tr. 234:17-235:3, 236:3-7 (Rogers); 703:14-24 (Byrn). Dr. Rogers
admitted that "for dutasteride to be active, it would have to be in a dissolved state." Tr. 236:6-7
(Rogers). In 1993, a person of ordinary skill in the art reading the '467 Patent could thus
visualize or recognize a pharmaceutically acceptable solvate of dutasteride as one that is
dissolved in one of the limited number of known safe solvents to ensure bioavailability and

---

[23] Defendants' arguments about the predictability of solvate formation are "misdirected." *See Germeyer*, 2010 WL 4961695, at *3. As in *Germeyer*, the asserted claims "do not require a [solvate] having a specific structure, and do not require that a [solvate] structure must be identified," and thus there is no reason why "a person of ordinary skill in the art … would not credit [GSK] with possession of [solvate] embodiments of the invention …." *Id.*

therapeutic effect.  PTX-145; PTX-178; PTX-341; Tr. 223:13-224:16 (Rogers); 661:6-15, 690:8-12, 690:24-691:6 (Byrn).[24]

## 2. The '467 Patent Enables the Full Scope of the Asserted Claims

### a) To Invalidate Patent Claims for Lack of Enablement, Evidence of "Undue" Experimentation is Required

The enablement requirement of Section 112 requires that the combination of the specification and what is known in the art teach a person of ordinary skill how to "make and use the invention without undue experimentation."  *In re Wands*, 858 F.2d 731, 736-37 (Fed. Cir. 1988).  Factors to be considered in determining whether undue experimentation would be required include the so-called *Wands* factors:

> (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.

*Id.* at 737.  "[T]he focus 'is not merely quantitative, since a considerable amount of experimentation is permissible, if it is merely routine, or if the specification in question provides a reasonable amount of guidance ….'" *Cephalon, Inc. v. Watson Pharms. Inc.*, 707 F.3d 1330, 1339 (Fed. Cir. 2013) (quotation omitted).

Claims are enabled even if "the trial and error required to practice the claimed invention [is not] unduly laborious or beyond the reach of one of ordinary skill in the art …." *Koito Mfg.*

---

[24] Defendants' reliance on *In re Alonso*, 545 F.3d 1015 (Fed. Cir. 2008), is misplaced.  Def. Br. at 15, 20.  There, the claims at issue involved a method of using monoclonal antibodies, but the specification disclosed only one antibody and taught "nothing about the structure … or pharmacological properties common to the large family of antibodies implicated by the method." *Id.* at 1021-22.  In finding insufficient written description for these antibodies, the Federal Circuit noted that "we have found adequate written description support for a claimed invention where the disclosure specifies 'relevant identifying characteristics,' such as 'complete or partial structure, … functional characteristics … or some combination of such characteristics.'" *Id.* at 1022 (citation omitted).  Here, in contrast, there is ample structural description of the claimed genus—dutasteride complexed with a safe solvent.

*Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1155 (Fed. Cir. 2004). Moreover, "a patent need not teach, ***and preferably omits***, what is well known in the art." *Hybritech, Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986) (emphasis added). "Enablement does not require an inventor to meet lofty standards for success in the commercial marketplace. [The Patent Act] does not require that a patent disclosure enable one of ordinary skill in the art to make and use a perfected, commercially viable embodiment absent a claim limitation to that effect." *CMFT Inc. v. Yieldup Int'l Corp.*, 349 F.3d 1333, 1338 (Fed. Cir. 2003).

The written description and enablement requirements "usually rise and fall together" because "a recitation of how to make and use the invention across the full breadth of the claim is ordinarily sufficient to demonstrate that the inventor possesses the full scope of the invention, and vice versa." *Lizardtech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1345 (Fed. Cir. 2005).

### b) One of Ordinary Skill in the Art Could Make and Use Pharmaceutically Acceptable Solvates of Dutasteride Without Undue Experimentation Based on the Disclosure of the '467 Patent

Under the *Wands* analysis, the evidence presented at trial demonstrates that the specification of the '467 Patent, combined with the well-known knowledge and skill of the art, would enable a person of ordinary skill to make and use pharmaceutically acceptable solvates of dutasteride without undue experimentation. Defendants did not and cannot present clear and convincing evidence to the contrary.[25]

---

[25] Defendants' brief only addresses (and misapplies) four *Wands* factors: breadth of the claims, predictability of the art, amount of guidance in the specification, and working examples. (Def. Br. at 22-25). This demonstrates Defendants' inability—and failure—to prove lack of enablement by clear and convincing evidence.

> **i.   The State of the Art of Solvates Was Well Developed in 1993, and Only Routine Experimentation Would Be Needed to Make Pharmaceutically Acceptable Solvates of Dutasteride**

By 1993, the state of the art of solvates was mature and well developed.  *See supra* at II.B.1.c.   In particular, a person of ordinary skill in the art could make pharmaceutically acceptable solvates of dutasteride using a routine process that could be performed over the course of a day or less.  Tr. 694:11-22, 696:16-697:16 (Byrn).

To obtain a pharmaceutically acceptable solvate, a person of ordinary skill in the art would: 1) make a solvate by dissolving the drug in a solvent; 2) test to confirm solvate formation; and 3) conduct dissolution experiments to determine whether the solvate was pharmaceutically acceptable.  Tr. 694:3-10 (Byrn).  To carry out the first step, one of ordinary skill would dissolve a compound in a warm solvent to achieve a solution.  Tr. 655:4-10 (Byrn); PTX-222; PTX-340.  If seeking to make a solid solvate, one would then let the solution cool sufficiently to yield a precipitate or crystals.  Tr. 655:13-18, 693:24-694:6, 695:14-696:9 (Byrn); JTX-5; DTX-300; PTX-135; PTX-144.  These steps could be carried out in half an hour to overnight.  Tr. 696:16-697:9 (Byrn).  The second step, confirming solvate formation, could be carried out using characterization methods that could be completed in an hour or less.   Tr. 701:13-20 (Byrn); JTX-5; PTX-135; PTX-222; PTX-359; DTX-300.0012-13; *see* Tr. 196:23-197:4 (Rogers).   Finally, one could perform dissolution testing on crystalline solvates[26] to determine whether a solvate was pharmaceutically acceptable, *i.e.* whether the molecules could dissolve in solution and be absorbed by the body.   Tr. 702:12-703:2 (Bryn); 195:22-196:2 (Rogers).  Dissolution testing could be done in a matter of hours.  Tr. 196:17-22 (Rogers); 704:8-

---

[26] Both experts agreed that in the case of solvated dutasteride in solution, dissolution testing would be unnecessary because the dutasteride could be administered in solution and would have a therapeutic effect.  Tr. 701:23-702:1 (Bryn); Tr. 236:18-237:12 (Rogers).

29

16 (Byrn); DTX-300.0013-14.   In the case of dutasteride, if the bioavailability of the solid solvate was not optimal, the solvate could be dissolved in a safe solvent such as propylene glycol to ensure bioavailability, as described in Example 3(D) of the '467 Patent.   Tr. 705:8-706:2 (Byrn); JTX-8 at col. 15:11-25.

The evidence also established that these routine techniques were known to persons of ordinary skill in the art in 1993.   Tr. 178:2-7 (Rogers); 693:17-706:2 (Byrn).   For example, Dr. Byrn testified that solvates of compounds can be made using several different solvents at once using a process called a "screen."   Tr. 657:7-21, 697:17-698:5 (Byrn).   These methods were known by at least 1963, and they were routine in 1993.   Tr. 698:8-11 (Byrn); PTX-135. Scientists at GSK used many of these routine techniques to make and identify pharmaceutically acceptable solvates of dutasteride.   In July 1993, GSK used formulations of dissolved dutasteride for *in vitro* and *in vivo* testing.   Tr. 541:9-542:17 (Batchelor).   In December 1993, GSK employee Dr. Robert Mook made crystalline solvates of dutasteride in just four days.   PTX-24.0200-204; Tr. 718:13-719:5 (Byrn).   And by July 31, 1994, GSK had made and characterized numerous crystalline solvates of dutasteride using routine screening methods.   JTX-5; Tr. 656:15-657:21, 697:17-699:20, 709:24-716:2 (Byrn).   In fact, GSK found that it was easier to obtain a crystalline hydrate of dutasteride than to obtain non-solvated dutasteride crystals.   JTX-37-00001.0004.

Routine experimentation of this sort does not constitute undue experimentation.   *See Wands*, 858 F.2d at 736-37.   In fact, the Federal Circuit has held that routine screening, such as the work performed by GSK (JTX-5), is exactly the type of experimentation that does not preclude enablement.   *Id.* ("Enablement is not precluded by the necessity for some experimentation such as routine screening."); *see also Xiong Cai*, 2011 WL 6127936, at *8.

30

Because the experimentation necessary to make pharmaceutically acceptable solvates of dutasteride was so routine, Defendants attempt to import additional requirements into the claims and argue that pharmaceutically acceptable solvates must "be physically and chemically stable, and be able to be produced consistently" (Def. Br. at 12), characteristics Dr. Rogers admitted were requirements of a finished drug product. Tr. 237:21-238:20 (Rogers). In its Markman ruling, the Court found, and the Defendants' conceded, that the claims are not directed to a "finished drug product." D.I. 243 at 8-9. As defined by the Patent and the Court, pharmaceutically acceptable solvates of dutasteride do not include specific manufacturing or stability characteristics. *Id.*; JTX-8 at col. 3:58-4:4. Even Dr. Rogers conceded that the requirements for FDA approval and large scale manufacturing differ from what is required for written description. Tr. 275:8-14 (Rogers); *see also* 704:20-705:7 (Byrn). Thus, nothing about GSK's decision not to manufacture a crystalline solvate because of potential manufacturing challenges leads to a conclusion that the hydrate GSK did make was not pharmaceutically acceptable.

### ii. The '467 Patent Provides Sufficient Direction, Guidance, and Working Examples To Enable A Person of Ordinary Skill in the Art to Make Pharmaceutically Acceptable Solvates of Dutasteride

The '467 Patent also provides guidance and examples for making pharmaceutically acceptable solvates of dutasteride. All of the solution formulations described in the '467 Patent, including Example 3(D) for an injectable formulation, teach a person skilled in the art how to make and use pharmaceutically acceptable solvates of dutasteride. JTX-8 at col. 9:9-65, col. 10:1-14, col. 11:23-29, col. 11:39-46, col. 11:51-61, col. 15:11-25. Dr. Rogers admitted that these solution formulations of dutasteride are enabled by the '467 Patent. Tr. 181:7-10 (Rogers).

31

The '467 Patent also discloses methods for making crystalline dutasteride that could be used to make pharmaceutically acceptable crystalline solvates of dutasteride.   JTX-8 at col. 12:20-14:23; JTX-5.0001.0008-09 and .0020-21; PTX-24.0200-204; Tr. 708:21-709:20, 714:24-716:2 (Byrn).   Indeed, GSK's Dr. Mook used one of the methods described in the '467 Patent and made a crystalline dutasteride solvate.   PTX-24.0200-204; Tr. 708:21-709:20, 766:17-23 (Byrn).   Dr. Mook did this in four days.   PTX-24.0200-204; Tr. 718:13-719:5 (Byrn).

### iii. Level of Skill in the Art of the '467 Patent Is Very High, Thus Reducing the Amount of Disclosure Required

The level of skill in the art of the '467 Patent is high.   The parties agree that one of ordinary skill in the art would have an advanced degree in organic or medicinal chemistry.   Tr. 130:9-20 (Rogers), 645:24-646:4 (Byrn).   Indeed Dr. Rogers' hypothetical person of ordinary skill would have access to a team of drug development scientists, and is therefore even *more* skilled than Dr. Byrn's hypothetical person.   *Id.*   There is no dispute that making solvates is well within the abilities of either hypothetical person.   Dr. Rogers made and characterized solvates when he was in college, long before he was a person of ordinary skill in the art.   Tr. 208:10-209:10, 209:22-210:9 (Rogers).   He also admitted that one of ordinary skill in the art in 1993 "would have knowledge of methods of how to try to make solvates if they were motivated to do so."   Tr. 178:5-7 (Rogers).   As a result, Dr. Rogers testified that this *Wands* factor "is probably neutral in terms of adding something to undue experimentation."   Tr. 178:7-8 (Rogers).   But the evidence does not support Dr. Rogers' position—the high level of skill in the art of the '467 Patent strongly supports a finding of enablement.

### iv. Nature of the Invention and the Predictability of the Art

The nature of the invention of the '467 Patent and the predictability of the art supports enablement of the asserted claims.   Dutasteride is a steroid, and as of 1993, it was known in the

pharmaceutical arts that steroids are prone to form solvates.  Tr. 193:2-4 (Rogers); 670:8-10, 670:3-22 (Byrn); PTX-144.0001-2 (citing Kuhnert-Brandsstatter study from 1971); PTX-135. Prior art patents taught that solvates of steroids form easily.  For example, U.S. Patent No. 4,391,755, issued in 1983, discloses a method of making steroid hydrates in a matter of hours by simply grinding the steroid and putting it in water.  PTX-359; Tr. 216:4-217:1 (Rogers).  Based on the known propensity of steroids to form solvates, a person of ordinary skill in the art in 1993 would expect that dutasteride would form solvates.  Tr. 722:4-20 (Byrn).  This expectation was confirmed by GSK's own work with dutasteride.  GSK scientists made crystalline dutasteride solvates by accident and concluded that it was actually easier to make a crystalline hydrate of dutasteride than the non-solvated form.  JTX-5-00001.0008-9; JTX-37-00001.0004.

### v.  The Breadth of the Asserted Claims is Limited

Finally, the asserted claims of the '467 Patent are narrow.  As an initial matter, the '467 Patent only claims solvates of dutasteride that are pharmaceutically acceptable.  Therefore, the '467 Patent needs to enable only those dutasteride solvates that are, in fact, safe and have some therapeutic effect.  Given the state of the art in 1993, the '467 Patent does just that.  *See supra* at II.B.2.b.i.  Making and testing those limited number of solvates is not undue experimentation. *See Wands,* 858 F.2d at 736-37.

Defendants' argument that the claims are broad because there are "three categories of pharmaceutically acceptable solvates: reacted, precipitated, and crystalline" is wrong.  Def. Br. at 22.  A complex of dutasteride with a solvent is a solvate regardless of how it is made or what form it takes.  *See supra* at II.B.1.b & c.  But even assuming Defendants were correct, the '467 Patent enables one of ordinary skill in the art to make and use "three categories of pharmaceutically acceptable solvates: reacted, precipitated, and crystalline."  Def. Br. at 22.  The

'467 Patent teaches how to make dutasteride and, as Dr. Rogers admits, "one of ordinary skill in the art in '93-95 … would have knowledge of methods of how to try to make solvates …."  Tr. 178:2-6 (Rogers).

### c)  The BPAI Recently Considered and Rejected Defendants' Argument on Lack of Enablement of Claimed Solvates

In three recent cases, the BPAI considered and rejected enablement positions similar to the ones made by the Defendants here.  In *Xiong Cai*, the claims involved a particular compound and its solvates.  Although the specification did not include working examples or guidance on how to make solvates, the BPAI concluded that the claims were enabled.  2011 WL 6127936, at *5-6.  In particular, the BPAI found that because the specification taught how to make the claimed compound, making the claimed solvates was a matter of routine screening for one of ordinary skill in the art.  *Id.* at *8.  That same rationale applies here.

The BPAI also concluded that "the Specification would have enabled those skilled in the art to use liquid formulations of solvates, hydrates, and polymorphs of the claimed compounds in the same way as liquid formulations of 'a compound of formula (I) (alone) or a pharmaceutically acceptable salt thereof,'" because evaluating solubility is routine in the art.  *Id.* at *9.  Similarly, in *Germeyer*, the BPAI found that claims to hydrates of steroids were enabled because the Examiner's "focus on predicting hydrate structure is misdirected."  2010 WL 4961695, at *3.

In *Ex parte Liu*, the claims at issue involved a genus of compounds and their pharmaceutically acceptable solvates.  Appeal 2009-015302, 2010 WL 3615693, at *1 (B.P.A.I. Sept. 15, 2010).  The Examiner argued that the claims were not enabled because solvate formation is unpredictable, and because "[t]here is no evidence that solvates of these compounds actually exist."  *Id.* at *3 (quotation omitted).  The BPAI disagreed, finding that "the Examiner has overemphasized the importance of working examples, and given too little credit to the

34

abilities of a person having ordinary skill in the art." *Id.* at *4 (quotation omitted).  The BPAI concluded that the claims were enabled because "solvates and hydrates are routinely produced and characterized empirically." *Id.*

In sum, Defendants failed to present clear and convincing evidence that, with the benefit of the disclosures in the '467 Patent, a person of ordinary skill in the art could not make pharmaceutically acceptable solvates of dutasteride with routine experimentation.

## C. Defendants Failed to Present Clear and Convincing Evidence that Merck Was the First to Discover the Claimed Invention

The evidence introduced at trial leaves no doubt that scientists at GSK discovered and made dutasteride and its solvates well before Merck's purported synthesis of the compound in May 1994.   Defendants' assertion of prior inventorship, based on speculation concerning redacted and excerpted Merck documents, does not amount to clear and convincing proof of invalidity under 35 U.S.C. § 102(g).  Indeed, the Defendants have not cited, and GSK has been unable to find, a single case that invalidates patent claims for prior invention without substantially more evidence of the circumstances surrounding the alleged prior invention, such as testimony from the prior inventor or at least someone involved in the prior invention.

### 1. The First to Reduce to Practice a Species Within a Genus Claim Has Priority of Invention to the Genus Claim

"Section 102(g) operates to ensure that a patent is awarded only to the 'first' inventor in law." *Apotex USA, Inc. v. Merck & Co., Inc.*, 254 F.3d 1031, 1035 (Fed. Cir. 2001).  A patent may thus be invalidated if the invention "was made in this country by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g).  To prove prior inventorship, a challenger must establish, by clear and convincing evidence, (1) that another person reduced the invention to practice first, or (2) that another was first to conceive of the invention, and then

35

exercised reasonable diligence in reducing the invention to practice.  *See Fox Grp., Inc. v. Cree, Inc.*, 700 F.3d 1300, 1304 (Fed. Cir. 2012).

"Conception is the formation in the mind of the inventor of a definite and permanent idea of the complete and operative invention, as it is therefore to be applied in practice."  *Creative Compounds, LLC v. Starmark Labs.*, 651 F.3d 1303, 1312 (Fed. Cir. 2011) (quotation omitted). In the context of chemical compounds, conception requires both the idea of the structure of the chemical and possession of an operative method of making it.  *See Oka v. Youssefyeh*, 849 F.2d 581, 583 (Fed. Cir. 1988).  Constructive reduction to practice occurs when a patent application is filed.  *Solvay S.A. v. Honeywell Int'l, Inc.*, 622 F.3d 1367, 1376 (Fed. Cir. 2010).  Actual reduction to practice requires proof "that the inventor actually prepared the composition and knew it would work."  *Hahn v. Wong*, 892 F.2d 1028, 1032 (Fed. Cir. 1989) (quotation omitted).

### 2.  The Evidence Demonstrates that GSK Conceived of and Made Both Dutasteride and Pharmaceutically Acceptable Solvates Thereof Well Before Merck

The evidence establishes that GSK made both dutasteride and pharmaceutically acceptable solvates thereof well before any alleged synthesis of dutasteride by Merck in 1994.

#### a)  Unrebutted Evidence Establishes that GSK Conceived and Made Dutasteride and Solvates of Dutasteride in 1993

In spring of 1993, Drs. Frye and Batchelor first conceived of dutasteride.  In particular, they discussed applying information discovered during their research on 6-azasteroids to a 4-azasteroid framework.  Tr. 524:18-525:13 (Batchelor); 583:14-584:4, 584:20-23, 585:20-24 (Frye).  On May 19, 1993, Dr. Frye recorded the idea in his laboratory notebook, depicting a 4-azasteroid backbone with a list of "R" groups to place in the C-17 position.  Tr. 584:24-585:24 (Frye); 942:2-22 (Davies); JTX-2-00001.0146.  One of the groups depicted shows dutasteride.

*Id.* Chemists who reported to Dr. Frye then synthesized the compounds. *See* Tr. 586:11-587:9 (Frye).

In July 1993, Dr. Robert Mook made dutasteride. His laboratory notebook records the synthesis, preparation, isolation, and characterization of the compound. Tr. 417:7-15 (Mook), 586:24-587:9 (Frye), 943:6-947:6 (Davies); JTX-63-00001.0060-61. Later in the summer of 1993, GSK made solution solvates of dutasteride to use in *in vitro* and *in vivo* tests designed to assess the pharmacological activity of the compound. Tr. 541:14-22 (Batchelor). By September 1993, the inventors and their team understood that dutasteride was a potent and selective dual 5AR inhibitor. Tr. 530:3-18 (Batchelor); PTX-73. Team meeting minutes reported that dutasteride was "the world's most potent 5AR inhibitor." PTX-73.0002.

On September 17, 1993, GSK filed the '280 Application. JTX-3. The patent application discloses the compound dutasteride, as well as dutasteride solvates. *Id.*; Tr. 726:23-727:5, 728:10-731:3 (Byrn). More specifically, Example 10D describes an injection formulation in which dutasteride was dissolved in propylene glycol and added to water. Tr. 728:10-729:21 (Byrn); 987:6-17 (Davies); JTX-3-00001.0023. GSK also made crystalline solvates of dutasteride as early as December 1993. In particular, Dr. Mook made a crystalline solvate of dutasteride in December 1993 and characterized it on January 6, 1994. Tr. 717:22-718:19 (Byrn); PTX-24.0200-204; JTX-5-00001.0021. Defendants do not dispute any of this, and concede that GSK made dutasteride in July 1993, and a crystalline hydrate of dutasteride in December 1993. Def. Br. at 9; Tr. 481:5-17 (Pirrung).

### b) Merck's Purported Synthesis of Dutasteride Did Not Occur Until May 1994, and the Evidence Does Not Establish Independent Conception

At best, the evidence demonstrated that Merck first synthesized dutasteride in May 1994, long *after* GSK first made the compound. Moreover, Defendants did not present evidence

37

showing that Merck independently conceived of dutasteride at all. To the contrary, it is reasonable to infer that Merck made dutasteride only after learning of GSK's work.

At trial, Dr. Pirrung testified that Merck made dutasteride in May 1994. Tr. 449:3-9 (Pirrung). The evidence he relied on consisted of (1) a single page from a laboratory notebook of Dr. Raman Bakshi, a scientist at Merck, (2) a single compound data sheet, and (3) a *Journal of Medicinal Chemistry* article co-authored by Dr. Bakshi. DTX-674; DTX-814.0004; DTX-816. Although a custodian of records authenticated these documents, no one from Merck testified at trial. *See* DTX-812; DTX-903. Dr. Bakshi never explained where he got the idea to make dutasteride, how he made it, or whether he tested it for activity. Indeed, Dr. Pirrung, the only witness to testify for the Defendants about Merck's alleged synthesis, admitted that he had "no idea" where Merck got the idea for dutasteride. Tr. 465:23-466:9 (Pirrung).

The sole notebook page upon which Dr. Pirrung relied does not demonstrate that Merck conceived of dutasteride or reduced it to practice. Tr. 947:21-948:3 (Davies). Because no data is provided, a person skilled in the art would have no way of knowing whether the correct compound had in fact been made. Tr. 948:5-21 (Davies). Similarly, the compound data sheet provides no data confirming actual synthesis of dutasteride, no test results from purported assays, and appears to report computer-calculated numbers based on the structure of the compound, rather than data derived from testing on the compound itself. Tr. 949:18-952:16 (Davies). Dr. Pirrung admitted that he could not determine from the documents whether Merck possessed data on dutasteride's pharmacological activity. Tr. 478:15-479:11 (Pirrung); DTX-814.004; DTX-816; *see also* Tr. 947:7-952:16 (Davies). Without knowing whether Merck generated any such data, there is no evidence that Merck appreciated that dutasteride worked for its intended purposes, *i.e.*, as a potent and selective dual inhibitor of 5AR. *See Estee Lauder Inc. v. L'Oreal*

38

*S.A.*, 129 F.3d 588, 593 (Fed. Cir. 1997) ("[A] reduction to practice does not occur until the inventor has determined that the invention will work for its intended purpose.").

Moreover, the evidence suggests that Dr. Bakshi did not independently conceive of dutasteride, but obtained the idea from GSK.  *See Solvay*, 622 F.3d at 1377-78 ("The definition and test of conception … necessitates that the conception of an invention be an original idea of the inventor.").  Merck's "monthly highlights" from December 1994 and March 1995, which summarize assays performed on dutasteride, describe dutasteride as a "Glaxo" compound.  PTX-404; PTX-405.  Furthermore, Dr. Bakshi's *Journal of Medicinal Chemistry* article refers to GSK's patent application in its discussion of compounds including dutasteride.  Tr. 471:18-24, 475:11-14 (Pirrung); DTX-674.0001 and .0004 n.12.  Thus, the evidence not only fails to establish that Merck conceived of dutasteride, but suggests that the idea for dutasteride originated with GSK.  Tr. 953:13-954:7 (Davies).

### c) Defendants' Argument that Merck's Later Synthesis of Dutasteride Anticipates the '467 Patent Ignores Applicable Legal Principles

Defendants' contention that Merck's later work anticipates because GSK had not yet conceived of *pharmaceutically acceptable solvates* of dutasteride is legally and factually incorrect.  *See* Def. Br. at 26-27.

First, Defendants fail to acknowledge the legal principle that prior reduction to practice of a species within a genus is sufficient to establish priority of invention.  *See Mikus v. Wachtel [I]*, 504 F.2d 1150, 1151-52 (C.C.P.A. 1974); *see also Aventis Pharma Deutschland GMBH v. Lupin, Ltd.*, 499 F.3d 1293, 1300 (Fed. Cir. 2007).  GSK's 1993 reduction to practice of the compound dutasteride is therefore sufficient to establish priority to the claimed genus of "dutasteride and pharmaceutically acceptable solvates thereof."  GSK was not required to establish that it made

both dutasteride and pharmaceutically solvates of dutasteride before Merck. Evidence that GSK was first to make dutasteride is sufficient to establish its priority.

Second, Defendants fail to acknowledge that GSK conceived of and reduced to practice pharmaceutically acceptable solvates of dutasteride months before Merck's alleged 1994 synthesis of dutasteride. *See supra* at II.C.2.a. In particular, GSK made solution solvates of dutasteride for testing in the summer of 1993, disclosed dutasteride and solution formulations in the '280 Application filed in September 1993, and then synthesized and characterized crystalline solvates of dutasteride in January 1994. Tr. 541:9-542:17 (Batchelor); 718:8-719:5, 726:23-727:5, 728:10-731:3 (Byrn); 987:6-17 (Davies); JTX-3-00001.0023. There is thus ample evidence that GSK prepared solvates of dutasteride and knew they would work well before May 1994.

In sum, Defendants failed to present clear and convincing evidence that Merck conceived of dutasteride or reduced it to practice within the meaning of § 102(g). To the contrary, the evidence at trial established that GSK was the first to synthesize dutasteride and its solvates, submit it for testing, and appreciate that it could act as an effective dual inhibitor. Merck's synthesis of dutasteride ten months later cannot anticipate the '467 Patent. Tr. 954:8-19 (Davies).

## III.    CONCLUSION

The Defendants have failed to establish the invalidity of the asserted claims of the '467 Patent. The Court should enter judgment in favor of GSK.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Derek J. Fahnestock*
_____

Jack B. Blumenfeld (#1014)
Derek J. Fahnestock (#4705)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
dfahnestock@mnat.com

*Attorneys for Plaintiff GlaxoSmithKline LLC*
*(f/k/a SmithKline Beecham Corporation)*

OF COUNSEL:

William F. Lee
Lisa J. Pirozzolo
Sarah R. Frazier
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA  02109
(617) 526-6000

Christopher R. Noyes
Andrew B. Zoltan
Corinne E. Atton
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10022
(212) 230-8800

April 8, 2013

41

## CERTIFICATE OF SERVICE

I hereby certify that on April 8, 2013, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 8, 2013, upon the following in the manner indicated:

John C. Phillips, Jr., Esquire                    *VIA ELECTRONIC MAIL*
Megan C. Haney, Esquire
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE  19806
*Attorneys for Banner Pharmacaps Inc., Mylan*
*Inc., Mylan Pharmaceuticals Inc. and Impax*
*Laboratories, Inc.*

C. Kyle Musgrove, Esquire                    *VIA ELECTRONIC MAIL*
Michael M. Shen, Esquire
HAYNES AND BOONE, LLP
1615 L Street, NW, Suite 800
Washington, DC  20036-5610
*Attorneys for Banner Pharmacaps, Inc.*
*and Impax Laboratories, Inc.*

Thomas B. King, Esquire                    *VIA ELECTRONIC MAIL*
HAYNES AND BOONE, LLP
18100 Von Karman Avenue, Suite 750
Irvine, CA  92612
*Attorneys for Banner Pharmacaps, Inc.*
*and Impax Laboratories, Inc.*

Phillip B. Philbin, Esquire                    *VIA ELECTRONIC MAIL*
Charles M. Jones II, Esquire
HAYNES AND BOONE, LLP
2323 Victory Avenue, Suite 700
Dallas, TX  75219
*Attorneys for Banner Pharmacaps, Inc.*
*and Impax Laboratories, Inc.*

1

James H. Wallace, Esquire                          *VIA ELECTRONIC MAIL*
Gregory Lyons, Esquire
Mark Pacella, Esquire
Lucy Stark, Esquire
WILEY REIN LLP
1776 K Street NW
Washington, DC  20006
*Attorneys for Mylan Inc. and Mylan*
*Pharmaceuticals Inc.*

Steven J. Fineman, Esquire                          *VIA ELECTRONIC MAIL*
Jason J. Rawnsley, Esquire
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE  19801
*Attorneys for Watson Laboratories, Inc.*
*– Florida*

Gary E. Hood, Esquire                               *VIA ELECTRONIC MAIL*
Mark T. Deming, Esquire
Jonathan Morgan Kirley, Esquire
POLSINELLI SHUGHART PC
161 North Clark Street, Suite 4200
Chicago, IL  60601
*Attorneys for Watson Laboratories, Inc.*
*– Florida*

Robyn H. Ast, Esquire                              *VIA ELECTRONIC MAIL*
POLSINELLI SHUGHART PC
100 South Fourth Street, Suite 1000
St. Louis, MO  63102
*Attorneys for Watson Laboratories, Inc*
*. – Florida*

Richard L. Horwitz, Esquire                        *VIA ELECTRONIC MAIL*
David E. Moore, Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
*Attorneys for Roxane Laboratories, Inc.*

2

Kenneth G. Schuler, Esquire                          *VIA ELECTRONIC MAIL*
Stephen R. Howe, Esquire
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, IL  60606
*Attorneys for Roxane Laboratories, Inc.*

Darryl H. Steensma, Esquire                          *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
12636 High Bluff Drive, Suite 400
San Diego, CA  92130
*Attorneys for Roxane Laboratories, Inc.*


                                        */s/ Derek J. Fahnestock*
                                        _____
                                        Derek J. Fahnestock (#4705)